# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Cannon Technologies, Inc.,

                Plaintiff,

                                        Civ. No. 08-6456 (RHK/RLE)
                                        **MEMORANDUM OPINION
                                        AND ORDER**

v.

Sensus Metering Systems, Inc.,

                Defendant/Third-Party Plaintiff,

v.

Vishay Intertechnology, Inc.,

                Third-Party Defendant.

---

David E. Harrell, Jr., Craig L. Weinstock, Locke, Lord, Bissell & Liddell, LLP, Houston, Texas, Bruce J. Douglas, Carrie L. Zochert, Larkin Hoffman Daly & Lindgren, Ltd., Minneapolis, Minnesota, for Plaintiff Cannon Technologies, Inc.

Alan M. Anderson, Sharna A. Wahlgren, Matthew R. Palen, Erin O. Dungan, Briggs and Morgan, P.A., Minneapolis, Minnesota, for Defendant/Third-Party Plaintiff Sensus Metering Systems, Inc.

Corey L. Gordon, Jerry W. Blackwell, Dionne P. Hayes, Michael R. Moline, Mark R. Jundt, Blackwell Burke, P.A., Minneapolis, Minnesota, for Third-Party Defendant Vishay Intertechnology, Inc.

---

## INTRODUCTION

This case involves the failure of electrical meters sold by Plaintiff Cannon

Technologies, Inc. ("Cannon"), which incorporated technology from Defendant/Third-

Party Plaintiff Sensus Metering Systems, Inc. ("Sensus") and Third-Party Defendant

Vishay Intertechnology, Inc. ("Vishay"). Cannon sued Sensus, asserting claims sounding in breach of warranty and fraud, and Sensus, in turn, brought similar third-party claims against Vishay. Sensus now moves for summary judgment on Cannon's claims, while Vishay moves for summary judgment on Sensus's third-party claims. For the reasons set forth below, each Motion will be granted in part and denied in part.

## OVERVIEW

The Court recites below the key facts precipitating the present dispute. A full understanding of the parties' claims – about which the Court has received nearly 200 pages of briefs – necessitates the use of complex technical terms and a rudimentary explanation of certain components used in electrical circuitry. From the "satellite view," however, this case is relatively straightforward: (1) Cannon purchased a product from Sensus that it claims was defective; (2) Sensus purchased a component used in that product from Vishay, which component Sensus claims was defective; and (3) Vishay claims that the component was not defective and that Sensus misused it, which is what caused the product to fail. The Court provides this simplistic overview in the hope of providing some context for the more detailed explanation that follows.

## BACKGROUND

Except where indicated below, the relevant facts are not in dispute.

## I.    Electric meters generally

Most persons are familiar with the electromechanical meters[1] typically employed by power companies to measure electricity use by a home.  Such meters contain wheels that spin as electricity is consumed; the wheels spin faster or slower depending upon whether more or less electricity is being used.  The wheels turn a series of dials that, when read together, provide a number indicating the amount of electricity used over a period of time.  Meter readers employed by power companies are required to manually read the dials at specified intervals (typically, once per month), record the number indicated, and subtract the previous meter reading to determine how much electricity the owner used and the amount to be billed.

Needless to say, reading electromechanical meters is an expensive and labor-intensive task.  Moreover, it is subject to potential problems such as human error, weather delays, etc.

By the late 1990s, technology had developed that would allow electric meters to store consumption data electronically, rather than through rotating wheels and dials as in electromechanical meters.  These electronic meters could also be combined with "automated meter reading" ("AMR") technology to allow consumption data to be retrieved remotely, thereby eliminating the need to manually read meters.

---

[1] "Electromechanical" means a device actuated or controlled by electricity.  Webster's Third New International Dictionary 732 (1986).

## II.    The parties

Cannon is a Minnesota corporation headquartered in Minneapolis.  Among other things, it produces AMR technology for use with electronic electric meters, and it combines that technology with electronic meters to form automated meter reading systems, which it then sells to end users (*i.e.*, power companies).

Sensus is a Delaware corporation headquartered in North Carolina.  It is a technology and communications company providing data collection and metering solutions to utility companies worldwide.

Vishay is a Delaware corporation headquartered in Pennsylvania.  It manufactures electrical components, including the key component in this case that allegedly failed.[2]

## III.    The iCon Meter

In 1999, Sentec Limited ("Sentec"), a small British technology start-up, approached Sensus with a design for a new electronic sensor that could be used in an electric meter.  (England 5/26/10 Dep. Tr. at 26-27; England 5/27/10 Dep. Tr. at 32-34, 38-42.)  Sensus liked the technology and decided to license it from Sentec.  (Id. at 41-42.)  It also contracted with Sentec to design an electric meter incorporating the electronic sensor.  (England 5/26/10 Dep. Tr. at 27.)  The intent was to design a "base" electronic meter that could be fitted with AMR technology to transmit consumption data to purchasers (power companies).

---

[2] To be precise, the component actually was manufactured by BCcomponents, Vishay's predecessor, which Vishay acquired in 2002.  (See Dungan Decl. Exs. 5, 8.)

Over the following year, Sentec developed a fully functioning electronic electric meter for Sensus, known as the iCon Form 2S meter (the "iCon Meter"). Sentec performed the design work for the iCon Meter, including the schematic and layout for its internal components. (Id. at 28-29.) Sentec's design was approved by Sensus's lead meter engineer, George Steiner, Jr. (Steiner Dep. Tr. at 8-11.) Steiner did not provide Sentec with any written specifications or guidelines for the components to be used in the meter, nor did he review or test any specific components selected by it for the meter. (Id. at 8-11, 180-82.) Instead, Sentec alone selected the meter's electrical components, and Sensus relied on Sentec's expertise in making those selections. (Id. at 8-12, 15, 180-81, 187; England 5/26/10 Dep. Tr. at 29-30, 33; England 5/27/10 Dep. Tr. at 86.)

## IV.    The 336 Capacitor and capacitors generally

Sentec designed the iCon Meter such that the power necessary to operate it passed through a component known as a "capacitor." (England 5/27/10 Dep. Tr. at 148; Steiner Dep. Tr. at 14.) A capacitor is a device designed to hold an electrical charge. The New Encyclopedia Britannica 823 (15th ed. 2010). Capacitors can be constructed in many different shapes and sizes and with a variety of materials, and hence the ability of different capacitors to hold a charge varies. A capacitor's ability to hold a charge – known as its "capacitance" – is measured in units called Farads, denoted by the symbol "F." Id.

In the iCon Meter, the capacitor was intended to limit the amount of electric current passing through to the meter's internal components, including the electricity-use

sensor, to prevent those components from being damaged in case of excess voltage. (England 5/26/10 Dep. Tr. at 45; England 5/27/10 Dep. Tr. at 148-49.) But because the power necessary to operate the Meter passed through the capacitor, the meter would stop functioning – meaning electricity would flow to a home without being recorded – if the capacitance of the capacitor fell too low. (Id. at 148-49.)

All capacitors experience what is known as "corona discharge" when exposed to a certain voltage of electricity (which voltage level varies by capacitor). (Henderson Dep. Tr. at 38-39.) The technical explanation for why corona discharge occurs is unimportant. What *is* important is that corona discharge typically will "short out" a capacitor, which could potentially cause a fire. (Id. at 39.) Some capacitors, however, are known as "self-healing." A "self-healing" capacitor is designed to continue functioning, rather than short out, if exposed to power "spikes" or other temporary voltage increases. (Id.; Dungan Decl. Ex. 15 at 13; Southerland Dep. Tr. at 96.) But when such a capacitor "heals," it loses some of its capacitance. (Dungan Decl. Ex. 15 at 13.) As a result, a capacitor constantly exposed to voltage above the "corona onset point" will constantly self-heal and, accordingly, constantly lose capacitance.

The capacitor Sentec selected for the iCon Meter was manufactured by Vishay and is known as the X2 Class MKP 336 2 electromagnetic interference suppression film capacitor (the "336 Capacitor"). The 336 Capacitor had a rated capacitance of 470

nanoFarads (nF).[4]  (England 5/26/10 Dep. Tr. at 50-51.)  "X2 Class" capacitors are self-healing.  (Stevens Dep. Tr. at 103-04.)

Vishay produced a specification sheet for the 336 Capacitor containing certain information about its salient qualities.  (See Hayes Aff. Ex. 9; Dungan Decl. Ex. 5.)  With respect to the parties' claims, the specification sheet is noteworthy in four respects:

- First, it indicated that the 336 Capacitor has a "tolerance" of plus or minus 20 percent (Dungan Decl. Exs. 11-14), meaning that each individual 336 Capacitor produced by Vishay has an initial capacitance between 376 nF (470-20%) and 564 nF (470+20%), due to manufacturing variances.  (Id. Ex. 15 at 29.)  In other words, when Vishay shipped a 336 Capacitor that was to be incorporated into an iCon Meter, it could have a capacitance as low as 376 nF "out of the box."  (Id.)

- Second, it contained no information about the 336 Capacitor's corona onset point.  Rather, it merely indicated that the Capacitor was rated for use at 275 volts.  (E.g., id. Ex. 11.)  Eventually, the parties learned that the 336 Capacitor experienced corona discharge beginning at approximately 220-230 volts.  (Stevens 4/14/10 Dep. Tr. at 104; Henderson Dep. Tr. at 39.)

- Third, it contained an "Application Notes" section providing that the 336 Capacitor was "[f]or X2 electromagnetic interference suppression in *across the line* applications."  (Dungan Decl. Ex. 11 (emphasis added).)  In the iCon Meter, however, the

---

[4] A nanoFarad is one-billionth of a Farad.

336 Capacitor was used in a "series impedance" application, rather than an "across the line" application. (England 5/26/10 Dep. Tr. at 31.)[5]

- Fourth, it indicated that the 336 Capacitor had passed international testing standard "IEC 60384.14 2nd edition." That standard subjects a capacitor to a 1,000 hour "accelerated life" test, after which, in order to pass, it cannot have lost more than 10% of its initial capacitance. (Id. at 58.) Although the 336 Capacitor passed that test, it nevertheless had a tendency to lose between 2 and 6 nF of capacitance for every 1,000 hours of use. (Stevens 4/14/10 Dep. Tr. at 144.)

## V. Sensus approaches Cannon

In 2003, Sensus approached Cannon to inquire about using Cannon's AMR technology with the iCon Meter. (Rummel Dep. Tr. at 45; Mazza 4/7/10 Dep. Tr. at 74.) At the time, Cannon was investigating meter manufacturers with which it could incorporate its AMR technology. (Branca 3/23/10 Dep. Tr. at 44.) Cannon agreed to pair its AMR technology with Sensus's iCon Meter due to the meter's "overall design excellence and flexibility." (Palen Decl. Ex. 7.) The two companies later executed a Product Development Agreement providing that Cannon would "undertake the design and development" of technology to be fully integrated into the iCon Meter. (Id. Ex. 9.)

During the next year, Cannon worked to integrate its AMR technology into the iCon Meter. The companies produced a test product combining the two that went through "beta trials" and "field" testing (*i.e.*, actual deployment and use). (Branca

---

[5] The parties have not clearly explained to this technologically unsophisticated Judge the difference between "series impedance" applications and "across the line" applications.

3/23/10 Dep. Tr. at 75-76; Palen Decl. Ex. 12.)  Ultimately, their efforts succeeded in producing a combined metering product called the MCT410iL meter (the "MCT Meter"). It was ready to ship to customers in September 2004.  (Id. Ex. 13.)

## VI.    Cannon begins selling the MCT Meter

Cannon was the exclusive seller of the MCT Meter.  (Cannon 3/24/10 Dep. Tr. at 81; Branca 3/23/10 Dep. Tr. at 97-98; McCall Dep. Tr. at 107.)  When one of its customers ordered the meter, Cannon would submit a purchase order to Sensus for the "base" iCon Meter.  (Branca 3/23/10 Dep. Tr. at 97; Rummel Dep. Tr. at 110-11.) Sensus would, in turn, contact Epic Technologies, Inc. ("Epic"), a contract manufacturer of both the iCon Meter and Cannon's AMR technology, which would combine the two to form the MCT Meter.  (Branca 3/23/10 Dep. Tr. at 97-98; McCall Dep. Tr. at 107.)  Epic would then ship the finished MCT Meter directly to Cannon's customer and bill Sensus for the iCon Meter and assembly.  (Id. at 107.)  Sensus would then bill Cannon for the iCon Meter.  (Id.; Palen Decl. Ex. 16.)

According to Sensus, its regular business practice was to send a purchase acknowledgement whenever it received a purchase order from Cannon.  (Mazza 4/7/10 Dep. Tr. at 108-09; Springer Decl. ¶ 3.)[6]  Sensus further contends that it sent its "standard Terms of Sale" to Cannon with each purchase acknowledgement.  (Mazza 4/7/10 Dep. Tr. at 109; Springer Decl. ¶ 4.)  The "Terms of Sale" (1) provided that Sensus would

---

[6] Cannon has moved to strike portions of the Declaration of Wendy Springer because she was not disclosed as having information about Sensus's purchase acknowledgements.  (See Doc. No. 105.)  Because the Court does not, and need not, rely on the disputed portion of Springer's Declaration in deciding the instant Motions, Cannon's Motion will be denied as moot.

warrant its iCon Meter for a period of 12 months from the date of installation or 18 months from the date of shipment, whichever occurred first, (2) disclaimed any implied warranties, and (3) provided that Pennsylvania law governed the transaction.  (E.g., Palen Decl. Ex. 16.)  Cannon disputes that it received purchase acknowledgements with the "Terms of Sale" from Sensus as a regular practice.  It avers instead that it received the "Terms of Sale" only in connection with three customer purchases in mid-2005, comprising a total of approximately 300 meters.  (Simons Decl. ¶ 3.)

## VII.    Problems arise

Sensus also sold its iCon Meter to Hunt Technologies, Inc. ("Hunt"), a Cannon competitor, which incorporated its own AMR technology into the meter.  In late 2005, Hunt contacted Sensus and informed it that approximately 1,000 of the meters it had purchased from Sensus were not functioning properly.  (Mazza 4/7/10 Dep. Tr. at 84.)  Sensus later determined that the 336 Capacitors in Hunt's meters were demonstrating a capacitance of between 160 and 230 nF, well below the 470 nF at which they were rated and too low to power the meter consistently.  (Hayes Aff. Ex. 12.)  Sensus then contacted Vishay for its assistance in identifying the cause of the capacitance drop.  (Id.)  It also requested the same help from Sentec.  (England 5/26/10 Dep. Tr. at 89-90.)

Vishay obtained samples of the capacitors in the Hunt meters and analyzed them. On November 7, 2005, it issued a report (the "8D Report") to Sensus regarding its findings.  (Dungan Decl. Ex. 17.)[7]  It advised Sensus that its use of the 336 Capacitor in

---

[7] The date on the report is "07/11/2005."  (Dungan Decl. Ex. 17.)  This corresponds to November 7, 2005, and not July 11, 2005, because the date is written in European format (day/month/year)

the iCon Meter was improper. It noted that the Capacitor was made for "across the line" applications, but it was "being used as series impedance." (Id.) According to Vishay, the 336 Capacitor could lose up to 10% of its capacitance over time, as indicated by the fact that it had passed the "IEC 60384.14 2nd edition" certification (and as disclosed on the specification sheet). And because the 336 Capacitor was used in the iCon Meter in a "series impedance" application, the potential loss of capacitance rendered it inappropriate for the iCon Meter. (Id. ("For your kind of application[] (capacitor connected to the mains by an impedance), where the stability of the capacitance value is of great importance, we would recommend [you] to use the X2 1772 series. This series has a different technology and is especially designed for applications where the capacitance value needs to be very stable over time, as in your application.").)[8]

## VIII. Sensus replaces the 336 Capacitor

According to Sensus, notwithstanding the 8D Report, it was not aware of a design defect in the iCon Meter.[9] Instead, it believed the problems Hunt had experienced were caused by a "bad batch" of capacitors that had been installed in Hunt's meters alone,

---

rather than American format (month/day/year); the report issued from Vishay's office in Roeselare, Belgium. (Id.) There does not appear to be any dispute that the correct date of the report is November 7, 2005.

[8] There is some suggestion that Vishay believed Sensus's use of the 336 Capacitor was improper for another reason: because it was "self-healing," meaning it would lose capacitance when exposed to excess voltage. Yet, the replacement suggested by Vishay also was an X2 Class – i.e., self-healing – capacitor. (E.g., Dungan Decl. Ex. 17.) And, in fact, Sensus later used that capacitor in the iCon Meter without problems. (England 5/26/10 Dep. Tr. at 169; Mazza 6/18/10 Dep. Tr. at 76.)

[9] Vishay later issued two other 8D Reports to Sensus containing the same findings as the November 7, 2005 report. (Dungan Decl. Exs. 18-19.)

since Sensus had not received similar complaints from other customers (including Cannon). (Mazza 4/7/10 Dep. Tr. at 88; Rummel Dep. Tr. at 68.) It further claims that it contacted Cannon in December 2005 to advise that it had discovered a problem with the 336 Capacitor and to ask whether Cannon had experienced problems similar to Hunt's. (Id.) Although Cannon acknowledges that it had a conversation with Sensus regarding Hunt's failed meters, it denies that the conversation took place in December 2005. (Simons Decl. ¶¶ 3-4.) It also disputes that the "improper" capacitor issue was discussed in that conversation. (Id. ¶ 5.)

Regardless, after Hunt reported its problems to Sensus, Sentec performed additional testing of the power supply in the iCon Meter. (England 5/26/10 Dep. Tr. at 117-18.) Following that testing, Sentec recommended that Sensus replace the 336 Capacitor with a different capacitor manufactured by EPCOS, Inc. ("EPCOS"). (Id.) Sensus agreed and began replacing the 336 Capacitor in all iCon Meters manufactured on or after January 20, 2006. (Mazza 5/11/10 Dep. Tr. at 21-22.) Sensus did not disclose this change to Cannon, and it continued selling Cannon iCon Meters with the 336 Capacitor between November 7, 2005 (the date of Vishay's 8D Report) and January 20, 2006 (the date it replaced the 336 Capacitor with the EPCOS capacitor). (Steiner Dep. Tr. at 181-82.) It later replaced the EPCOS capacitor with the "X2 1772 series" capacitor recommended by Vishay. (England 5/26/10 Dep. Tr. at 169.) There have been no reported power problems with iCon Meters manufactured on or after January 20, 2006. (Mazza 6/18/10 Dep. Tr. at 76.)

## IX.     Cannon's customers begin to complain

In early 2008, one of Cannon's MCT Meter customers, North Star Electric ("North Star"), reported that some of its Meters were in a "strange operating state." (Branca 3/23/10 Dep. Tr. at 116.) Cannon sent those meters to its in-house engineering department, which determined that their power supply was unstable. (Id. at 116-17.) It then contacted Sensus, which advised Cannon that it should check the capacitor because the meters at issue contained the 336 Capacitor, which Sensus had not used for more than two years. (Id. at 117.) According to Cannon, this was the first time it learned that the 336 Capacitor could degrade and cause power problems in the MCT Meter. (Id.; Simons Decl. ¶ 5.)[10] Although many of the MCT Meters continued to function (Branca 4/27/10 Dep. Tr. at 209; Mazza 4/7/10 Dep. Tr. at 95-96), Cannon eventually replaced all of the Meters it had sold containing the 336 Capacitor, approximately 96,000 in all. Sensus has refused to pay for those replacements.

There is no dispute among the parties that the 336 Capacitors in many iCon Meters failed because they lost capacitance. What is *not* clear, however, is whether that occurred because of (a) corona discharge and the "self-healing" nature of the Capacitor; (b) use of the Capacitor in a "series impedance" application rather than an "across the line"

---

[10] Sensus contends that it initially believed there was a manufacturing defect with North Star's MCT Meters. Accordingly, it tested a small number of those meters, along with Cannon, to identify when they were manufactured, in the hopes of identifying the "manufacturing problem." (Sensus Mem. in Supp. at 10.) Cannon claims that Sensus undertook these actions to cover up its knowledge that the iCon Meter was defective. (Cannon Mem. at 13-16.)

application; (c) the Capacitor's tendency to lose between 2 and 6 nF of capacitance for every 1,000 hours of use; or (d) some combination of the foregoing.[11]

## X.    Litigation ensues

In December 2008, Cannon commenced the instant action against Sensus, asserting claims for breach of warranty and breach of contract; Sensus filed an Answer denying Cannon's allegations.  Sensus later amended its Answer to assert third-party claims against Vishay.  After some additional amendments, the parties' pleadings now assert the following claims:  Cannon asserts claims for breach of warranty, breach of contract, fraud, and violation of Minnesota's Deceptive Trade Practices Act ("DTPA"), Minnesota Statutes Section 325D.44, against Sensus, while Sensus asserts claims against Vishay for contribution and indemnification, breach of express warranty, breach of implied warranty of merchantability, and violation of the DTPA.

Following extensive discovery, Sensus now moves for summary judgment on Cannon's claims, and Vishay moves for summary judgment on Sensus's third-party claims.  The arguments have been "briefed to death," United States *ex rel.* Robinson v. Northrop Grumman Corp., No. 89 C 6111, 2002 WL 31478259, at *2 (N.D. Ill. Nov. 5, 2002), including supplemental briefing requested by the Court to clarify certain issues in advance of oral argument.  The Court held a lengthy hearing on the Motions on August 16, 2010, and they are now ripe for disposition.

---

[11] Pointing to the 8D Reports, Sensus asserts that "Vishay ultimately concluded that the capacitance loss in Sensus's meters was caused by corona discharge."  (Sensus Mem. in Opp'n at 16.)  But the 8D Reports nowhere use the term "corona discharge."  The only "flaw" mentioned in the Reports is that the 336 Capacitor was being used in a "series impedance" application rather than an "across the line" application.  (See Dungan Decl. Exs. 17-19.)

**STANDARD OF DECISION**

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. Id. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Graves v. Ark. Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

In light of the foregoing, the Court views the facts in the light most favorable to Cannon when reviewing Sensus's Motion, and in the light most favorable to Sensus when reviewing Vishay's Motion.

**ANALYSIS**

**I.      Cannon's claims against Sensus**

As noted above, Cannon has asserted four claims against Sensus: breach of contract, breach of warranty, fraud, and violation of the DTPA. On its face, the breach-of-warranty claim concerns only warranties implied under the law, namely, the implied

warranties of merchantability and fitness for a particular purpose.  (See Doc. No. 33 ¶¶ 15-18.)  Yet, both Cannon and Sensus have construed Cannon's breach-of-*contract* claim to assert breach of an *express warranty* by Sensus.  (See Sensus Mem. in Supp. at 11-12; Cannon Mem. at 26-34.)  The Court follows their lead and will analyze the breach-of-contract claim as if it asserts breach of an express warranty.  And the Court begins its analysis with that claim.

## A.  Breach of express warranty

In a typical express-warranty case, the plaintiff points to a document containing the warranty allegedly breached by the defendant.  That is not the case here.  While Sensus contends that the "Terms of Sale" it sent with its purchase acknowledgements contains the "express warranty" (Sensus Mem. in Supp. at 11 n.4), Cannon disputes that assertion, arguing that the "Terms of Sale" was not sent with each purchase acknowledgement.  Rather, it argues that Sensus offered an *oral* warranty covering the iCon Meter.  (Cannon Mem. at 26.)[12]

Regardless of *how* the warranty arose, however, the parties agree that Sensus warranted the iCon Meters it sold to Cannon for 12 months from the date of installation or 18 months from the date of shipment, whichever occurred first.  (Sensus. Mem. in

---

[12] Because of this disagreement, the parties also dispute whether Pennsylvania law (as in the choice-of-law clause in the "Terms of Sale") or Minnesota law governs the express-warranty claim.  The Court need not resolve that dispute, because the elements of a breach-of-warranty claim are the same under both Pennsylvania and Minnesota law.  Compare Peterson v. Bendix Home Sys., Inc., 318 N.W.2d 50, 52-53 (Minn. 1982) with Price v. Chevrolet Motor Div. of Gen. Motors Corp., 765 A.2d 800, 809 (Pa. Super. Ct. 2000).

Supp. at 12; Cannon Mem. at 26.)  And it is for this reason that Cannon's claim fails, because none of the iCon Meters at issue failed during the express-warranty period.

Cannon does not dispute Sensus's claim that its express warranty expired at the latest on July 20, 2007 – 18 months from January 20, 2006, the date Sensus replaced the 336 Capacitor with the EPCOS capacitor.  (Cannon Mem. at 26.)  Nor does Cannon argue that any of its MCT Meters containing the 336 Capacitor failed on or before that date. Hence, the breach-of-express-warranty claim necessarily fails.  See, e.g., Abraham v. Volkswagen of Am., Inc., 795 F.2d 238, 250 (2d Cir. 1986) ("[A]n express warranty does not cover [defects occurring] after the applicable time . . . period[] ha[s] elapsed.").

Cannon argues, however, that Sensus breached its express warranty because all of the iCon Meters were defective on the date they were sold, since they contained a part doomed to fail.  (Cannon Mem. at 26-27.)  This argument lacks merit.  As this Court has noted previously, a claim alleging breach of an express warranty of future performance cannot accrue until a defect actually manifests itself.  See O'Neil v. Simplicity, Inc., 553 F. Supp. 2d 1110, 1115 (D. Minn. 2008) (Kyle, J.) ("It is simply not enough for a plaintiff to allege that a product [contains a] defect . . . . [T]he plaintiff must instead allege an *actual manifestation* of the defect *that results in some injury* in order to state a cognizable claim for breach of warranty.") (emphasis in original), aff'd, 574 F.3d 501 (8th Cir. 2009).  That is consistent with the Uniform Commercial Code ("UCC"), which provides that a "breach of warranty occurs when tender of delivery is made, *except that where a warranty explicitly extends to future performance of the goods . . . the cause of action accrues when the breach is or should have been discovered*."  UCC § 2-725(2) (emphasis

added).[13]  Were it otherwise, temporal limitations on express warranties would have no

meaning.  A plaintiff could always claim that a defect manifesting itself after the express-

warranty period was endemic to the product on the date it was purchased, and hence the

product was "defective" when bought.  Such a rule is non-sensical.  See Abraham, 795

F.2d at 250.

Accordingly, even if Cannon were correct that the iCon Meters were "defective"

when purchased, its express-warranty claim would still fail because that defect did not

manifest itself until after the warranty period had ended.  See, e.g., Canal Elec. Co. v.

Westinghouse Elec. Co., 973 F.2d 988, 993 (1st Cir. 1992) ("[T]ime-limited warranties

do not protect buyers against hidden defects . . . that may exist before, but typically are

not discovered until after, the expiration of the warranty period.").[14]

### B.    Breach of implied warranty

Under the UCC, a warranty of merchantability is implied into every contract for

the sale of goods, unless disclaimed or otherwise excluded.  UCC § 2-314(1).  Such a

---

[13] Both Minnesota and Pennsylvania have adopted the UCC, as have all other states (at least in part).  In light of this fact, the Court (1) frequently cites cases in this Opinion from states other than Minnesota or Pennsylvania and (2) cites sections of the UCC by their number in that Code (e.g., "UCC § 2-725") rather than their state-specific citations (e.g., "Minn. Stat. § 336.2-725").

[14] At oral argument, Cannon seemed to assert – for the first time – that the express-warranty period lasted for "15 to 20" years, based on Sensus's representations about the expected life of the iCon Meter.  (See 8/16/10 Hearing Transcript ("Hear. Tr.") at 27.)  Such an assertion is drastically different from that in Cannon's brief, in which it asserted that "[b]oth parties agree that Sensus offered verbal express warranties covering the iCon [Meter] *for either 12 months from the date of installation or 18 months from the date of shipment, whichever occurred first.*"  (Cannon Mem. at 26 (emphasis added).)  It is also belied by the testimony of Cannon's own witnesses, who agreed that any express warranty was limited to a 12-18 month term.  (Branca 3/23/10 Dep. Tr. at 115; Cannon 3/24/10 Dep. Tr. at 57-58, 61.)  In any event, this amorphous representation is, in the Court's view, insufficient to constitute an express warranty.  If the iCon Meter failed in year 16, for example, would Cannon be entitled to relief under such a warranty?

warranty ensures that the goods will be "fit for the ordinary purposes for which such goods are used." Id. § 2-314(2)(c). An implied warranty of fitness for a particular purpose also is implied into a contract for the sale of goods, unless disclaimed or otherwise excluded, when the seller "has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." Id. § 2-315. That warranty provides a minimum level of assurance that the goods are suitable for the buyer's purpose. Goodman v. PPG Indus., Inc., 849 A.2d 1239, 1245 (Pa. Super. Ct. 2004).

Here, Cannon concedes that the particular purpose for which the iCon Meter was used – measuring electricity usage – was the same as its ordinary use. (Branca 3/23/10 Dep. Tr. at 247-48.) Hence, the two warranties merge. See, e.g., Cartillar v. Turbine Conversions, Ltd., 187 F.3d 858, 861 n.5 (8th Cir. 1999) (where "the particular purpose for which goods are to be used coincides with their general functional use, the implied warranty of fitness for a particular purpose merges with the implied warranty of merchantability"). The question for resolution, then, is whether there exists a genuine issue that the iCon Meter was not fit for its ordinary use. The Court determines that question must be answered in the affirmative.

## 1. Sophisticated buyers

The implied warranty of merchantability is breached only when a product "is defective to *a normal buyer* making ordinary use of the product." Peterson v. Bendix Home Sys., Inc., 318 N.W.2d 50, 53 (Minn. 1982) (emphasis added); accord, e.g., Kelley Metal Trading Co. v. Al-Jon/United, Inc., 877 F. Supp. 1478, 1483 (D. Kan. 1995)

(warranty extends to an "*ordinary* buyer in a normal commercial transaction") (emphasis added); Lipnick v. Reisinger, 859 N.E.2d 600, 604 (Ohio Ct. App. 2006) (same). Sensus argues at the outset that no implied warranty arose here because Cannon was not a "normal buyer" of the iCon Meter, but rather was a "sophisticated business entit[y] whose skill and knowledge regarding electrical meters" was equal to its own. (Sensus Mem. in Supp. at 14.)

Some courts have, indeed, recognized that where a buyer is sophisticated and possesses skill or knowledge about a product equal or superior to the seller's, no implied warranty of merchantability arises. See, e.g., Binks Mfg. Co. v. Nat'l Presto Indus., Inc., 709 F.2d 1109, 1121-22 (7th Cir. 1983); Price Bros. Co. v. Phila. Gear Corp., 649 F.2d 416, 424 (6th Cir. 1981). Those cases, however, are inapposite here because they involved the purchase of products that the buyers helped the sellers design. There is no evidence before the Court that Cannon had any input in the design of the iCon Meter – indeed, the record reflects that Sensus designed the meter well before it approached Cannon in 2003 to inquire about forming a partnership. While Sensus points out that Cannon helped design the *MCT Meter*, that is not the product Cannon was buying from Sensus. Rather, Cannon purchased the *iCon Meter* from Sensus, and then worked with Sensus to integrate its AMR technology into that product.[15]

---

[15] Sensus notes that during "beta testing" of the MCT Meter, Cannon asked it to replace one of the iCon Meter's capacitors. But there is no evidence that this request was due to Cannon's equal or superior knowledge of the manner in which the iCon Meter operated. Rather, it simply asked Sensus to use a smaller capacitor because the one being used was "hitting [Cannon's] transformer." (Palen Decl. Ex. 11.)

Moreover, <u>Binks</u> and <u>Price</u> were predicated on the fact that the products at issue were unique and, hence, there was "no proof or evidence pointing to a record of past years on which a determination of [the product's] ordinary purpose could be found." <u>Binks</u>, 709 F.2d at 1122 (citing <u>Price</u>, 649 F.2d at 424). But the product being purchased here – the iCon Meter – was not unique. Rather, it was being sold to several other companies with their own AMR technology, including Hunt. (<u>See</u> Mazza 4/7/10 Dep. Tr. at 84-85; Rummel Dep. Tr. at 15; Weinstock Decl. Ex. 27.) Hence, there is no problem establishing the "ordinary purpose" of the iCon Meter, which both parties agree was to measure electricity usage.

Simply put, <u>Binks</u> and <u>Price</u> are not applicable here. But even if they were, and even if Sensus were correct that Cannon had some input on the design of the iCon Meter, on the present record the Court would conclude that there exists a genuine issue as to the comparative level of Cannon's skill and knowledge regarding the meter's design. That conclusion is consistent with an analogous – and instructive – provision of the UCC. Section 2-316(3)(b) provides that "when the buyer before entering into the contract has examined the goods or the sample or model as fully as desired . . . [,] there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed." <u>See also</u> <u>Driscoll v. Standard Hardware, Inc.</u>, __ N.W.2d __, 2010 WL 2813532, at *9-10 (Minn. Ct. App. July 20, 2010). That is the real tenor of Sensus's argument here: Cannon had more than a year to work with Sensus in developing and "beta testing" the MCT Meter and, hence, it was in a position to learn about the problem with the 336 Capacitor. (<u>See</u> Sensus Mem. in Supp. at 14.) Yet, there is a dearth of

evidence in the record to support the conclusion that Cannon should have learned of the defect with the 336 Capacitor through such testing. Indeed, Sensus itself did not recognize the problem when designing the iCon Meter or testing it. Moreover, Cannon only tested the MCT Meter for approximately one year, but it took several years for it to fail "in the field." Under these circumstances, where the defect was "not obvious upon mere examination," whether it should have been discovered "is a question for the jury." Canadian Pac. Ry. Co. v. Williams-Hayward Protective Coatings, Inc., No. 02 C 8800, 2005 WL 782698, at *14 (N.D. Ill Apr. 6, 2005); accord, e.g., Henry Heide, Inc. v. WRH Prods. Co., 766 F.2d 105, 110-11 (3d Cir. 1985); HWH Corp. v. Deltrol Corp., No. C07-0059, 2009 WL 734710, at *6 (N.D. Iowa Mar. 19, 2009).

For all of these reasons, the Court concludes that summary judgment based on Cannon's so-called "equal or superior knowledge" is inappropriate.[16]

## 2. The disclaimer issue

Sensus next argues that even if an implied warranty arose, it was expressly disclaimed in the "Terms of Sale" it sent with every purchase acknowledgement. (Sensus Mem. in Supp. at 12-13.) As noted above, however, there is a dispute whether Sensus routinely sent the "Terms of Sale" with those acknowledgements. Given that dispute, the

---

[16] At oral argument, Sensus tried to morph its "sophisticated buyer" argument into one of reliance, contending that "because there was no reliance by Cannon on some particular expertise of Sensus, . . . there is no implied warranty." (Hear. Tr. at 11.) While that argument might have some appeal with respect to an implied warranty of *fitness for a particular purpose* – which expressly requires a buyer to "rely[] on the seller's skill or judgment to select or furnish suitable goods," UCC § 2-315 – it has no application with respect to the implied warranty of *merchantability*. See, e.g., Steffy v. Home Depot, Inc., No. 1:06-CV-2227, 2009 WL 904966, at *13 n.3 (M.D. Pa. Mar. 31, 2009) ("[R]eliance is not an element of a claim for breach of the implied warranty of merchantability."); Drobnak v. Andersen Corp., Civ. No. 07-2249, 2008 WL 80632, at *7 (D. Minn. Jan. 8, 2008) (Magnuson, J.), aff'd, 561 F.3d 778 (8th Cir. 2009) (same).

Court cannot determine at the summary-judgment stage whether Sensus validly disclaimed implied warranties for all iCon Meters it sold to Cannon; there remains a genuine issue of fact as to that contention.

### 3. The warranty's limit

In its final implied-warranty argument, Sensus contends that the term of any such warranty must be limited to that of the express warranty – that is, no more than 18 months. (Sensus Mem. in Supp. at 17-18.) And, like the express-warranty claim, Sensus argues that "[b]ecause there is no evidence that any of the Meters . . . suffered capacitor related failures on or before July 20, 2007, Cannon's claims for breach of implied warranties fail as a matter of law." (Id. at 17.) This argument, however, is predicated on a misapprehension of implied warranties.

As noted above, the breach-of-express-warranty claim accrued only when Cannon's meters began to fail. This is because the express warranty extended to the future performance of the meters, and under the UCC, "where a warranty explicitly extends to future performance of the goods[,] . . . the cause of action [for breach of warranty] accrues when the breach is or should have been discovered." UCC § 2-725(2). However, an implied warranty, by its very nature, cannot *explicitly* extend to future performance of a product. Highway Sales, Inc. v. Blue Bird Corp., 559 F.3d 782, 788-89 (8th Cir. 2009). Accordingly, a "breach of implied warranty occurs, and the claim accrues, when tender of delivery is made." Id. (citation omitted).

The foregoing makes clear why Sensus's argument must be rejected. For purposes of the implied-warranty claim, whether the meters failed within the time period

delineated by the express warranty is not dispositive.  Rather, the issue is whether Sensus breached the implied warranty of merchantability when the claim accrued, that is, *when it tendered delivery of the iCon Meters*.  In other words:  were the meters "defective" when Sensus tendered them?

Under the facts here, a reasonable jury could answer this question, "Yes."  A product is defective if it "fail[s] in normal use and cause[s] the injury complained of." Farr v. Armstrong Rubber Co., 179 N.W.2d 64, 69 (Minn. 1970).  The evidence shows that the iCon Meters sold to Cannon failed when put to their normal use – measuring electricity usage.  Although the failures happened several years after the meters were sold, that fact is relevant to show whether they were defective at sale.  See, e.g., City of Stoughton v. Thomasson Lumber Co., 675 N.W.2d 487, 493 (Wis. Ct. App. 2003) ("Evidence that the goods break or physically deteriorate after delivery may be relevant to whether the goods were fit at the time of delivery for the ordinary purpose for which they are used."); 141 S. Main, Inc. v. Magic Fingers, Inc., 364 N.E.2d 605, 608 (Ill. App. Ct. 1977) (for purposes of implied warranty, product may be defective even if defect did not "manifest itself immediately" upon sale); Mosier v. Am. Motors Corp., 303 F. Supp. 44, 51 (S.D. Tex. 1967) (breach of implied warranty of merchantability requires evidence that product was defective when sold; such evidence existed because it was shown that product "would not stand up under normal use").

What Sensus seems to be arguing is that the iCon Meters were not defective *when sold* because they did not fail within 18 months, the maximum length of the express warranty.  But there is a plethora of evidence in the record to suggest that the expected

life of the meters was far more than 18 months. (See, e.g., Cannon Decl. ¶ 4 (Sensus told Cannon the meters had an expected 15-year life); England 5/27/10 Dep. Tr. at 133 (Sensus discussed with Sentec at design meetings that expected product life would be 15-20 years); Uram Dep. Tr. at 25-26 (power companies expected electronic meters to have lifespan of approximately one-half that of electromechanical meters, which typically lasted for 25 years).) Indeed, common sense suggests that power companies would be reluctant to expend significant money on electronic meters if they had to replace them every 18 months. (See also England 5/27/10 Dep. Tr. at 133 (15-to-20 year lifespan important for power companies so that it is "cost effective to install the product").) Moreover, Sensus admitted in its Third-Party Complaint against Vishay that the 336 Capacitor "was not appropriate for the meters in issue." (Doc. No. 55 ¶ 14.) It is disingenuous, therefore, for it to now argue that the iCon Meters were not defective at sale.

For all of these reasons, the Court concludes that genuine issues of material fact preclude summary judgment on Cannon's implied-warranty claim.

### C. Fraud

Cannon asserts that Sensus engaged in fraud by failing to disclose that the 336 Capacitor was defective. (Cannon Mem. at 34.) Before analyzing this claim, the Court must briefly address a choice-of-law issue.

### 1. Pennsylvania law or Minnesota law?

Sensus argues that the fraud claim is governed by Pennsylvania law due to the choice-of-law clause in the "Terms of Sale." As a result, it contends that the claim is

barred by the economic-loss doctrine, which (generally speaking) precludes the recovery in tort for claims flowing from a contract. See, e.g., Werwinski v. Ford Motor Co., 286 F.3d 661, 671 (3d Cir. 2002). Cannon does not appear to quibble with the notion that its fraud claim would be barred by the economic-loss doctrine under Pennsylvania law. However, it contends that Minnesota law, not Pennsylvania law, must apply to the claim, because it disputes whether Sensus sent the "Terms of Sale" with each purchase acknowledgement. And in Minnesota, fraud claims are not barred by the economic-loss doctrine. See Minn. Stat. § 604.10(e).

Because there exists a genuine issue of material fact whether the "Terms of Sale" was sent with each purchase acknowledgement, the Court cannot resolve at this juncture whether Pennsylvania law (which bars the claim) or Minnesota law (which does not) is applicable here. Hence, it must proceed to analyze this claim under Minnesota law.

## 2. The duty to disclose

As a general rule, under Minnesota law one party to a transaction "has no duty to disclose material facts to the other." Taylor Inv. Corp. v. Weil, 169 F. Supp. 2d 1046, 1064 (D. Minn. 2001) (Tunheim, J.) (citing L & H Airco, Inc. v. Rapistan Corp., 446 N.W.2d 372, 380 (Minn. 1989)). Hence, fraud does not exist based solely on the failure to disclose facts unless "special circumstances" require that disclosure. Am. Computer Trust Leasing v. Boerboom Int'l, Inc., 967 F.2d 1208, 1211-12 (8th Cir. 1992) (citing L & H Airco, 446 N.W.2d at 380). Three such "special circumstances" have been recognized by the Minnesota Supreme Court: where there exists a confidential or fiduciary relationship between the parties; where disclosure is necessary to clarify

information already disclosed, which would otherwise be misleading; or where the non-disclosing party "has special knowledge of material facts to which the other party does not have access." L & H Airco, 446 N.W.2d at 380; accord, e.g., Heidbreder v. Carton, 645 N.W.2d 355, 367 (Minn. 2002); Richfield Bank & Trust Co. v. Sjogren, 244 N.W.2d 648, 650 (Minn. 1976).

Cannon proceeds on the third prong, arguing that "Sensus fraudulently concealed special knowledge," namely, the 336 Capacitor was defective as used in the iCon Meter's design and, hence, the meter ultimately would fail. (Cannon Mem. at 33.) In the Court's view, this was "special knowledge" Sensus was obligated to disclose, and which Cannon could not reasonably obtain.

According to Cannon, Sensus knew as of November 7, 2005 – the date of the first 8D Report from Vishay – that it was "misusing" the 336 Capacitor, which would lead the iCon Meter to fail. (Id. at 31.) Sensus disputes that assertion and claims that it was unsure at that time whether there existed a systemic problem with the meter. A reasonable jury, however, could conclude from the 8D Report that Sensus was aware of a defect inherent in the meter's design. Moreover, there was no way Cannon could have been aware of this information. It did not receive the 8D Report. And while Sensus asserts that it informed Cannon of the Report's contents in December 2005, Cannon hotly disputes that assertion.

If a jury were to credit Cannon's version of events, it could conclude that (1) Sensus knew of the problem with the meter in November 2005, (2) Cannon was not aware of the problem and had no avenue to obtain that knowledge, and (3) Sensus failed

to disclose the problem before selling additional meters to Cannon.  That is sufficient to support a finding of fraud.  See Valspar Refinish, Inc. v. Gaylord's, Inc., 764 N.W.2d 359, 368 (Minn. 2009).

### 3.    Fraud damages

The Court agrees with Sensus, however, that any damages flowing from its allegedly fraudulent conduct must be limited on the facts here.  Cannon alleges that Sensus became aware of the problem with the iCon Meter sometime on or after November 7, 2005, the date of Vishay's first 8D Report.  Hence, the fraud could only have occurred, at the earliest, on November 7, 2005.  Since Sensus stopped selling iCon Meters containing the 336 Capacitor on January 20, 2006, Cannon's damages are necessarily limited to the period from that date to the date it received the 8D Report from Vishay.[17]

### D.    Deceptive Trade Practice Act ("DTPA")

The Court need not linger long on Cannon's claim under the DTPA.  It is well-settled that monetary damages are not available under that statute; "the sole statutory remedy for deceptive trade practices is injunctive relief."  O'Neil, 553 F. Supp. 2d at 1113 n.4 (citations omitted); accord, e.g., Summit Recovery, LLC v. Credit Card Reseller, LLC, Civ. No. 08-5273, 2010 WL 1427322, at *5 (D. Minn. Apr. 9, 2010) (Doty, J.); State ex rel. Hatch v. Cross Country Bank, Inc., 703 N.W.2d 562, 573 (Minn.

---

[17] Cannon argues that Sensus withheld the contents of the initial 8D Report in an "attempt[] to hide this information until the express warranty period on the meters had lapsed."  (Cannon Mem. at 34.)  But even if the information had been disclosed sooner, Sensus would have had no obligation to replace the meters under the express warranty, since none of them had failed as of November 2005.  (See supra at 16-18.)

Ct. App. 2005); <u>Alisides v. Brown Inst., Ltd.</u>, 592 N.W.2d 468, 476 (Minn. Ct. App. 1999). Here, the deceptive conduct alleged by Cannon occurred in the past: Sensus's (mis)representations concerning the iCon Meters containing the 336 Capacitor, which Sensus no longer sells. Accordingly, relief under the DTPA cannot be had. <u>See</u> <u>Summit Recovery</u>, 2010 WL 1427322, at *5.[18]

**E.    Damages**

Lastly, Sensus argues that if any of Cannon's claims survive its Motion, the recoverable damages must be limited, for two reasons.

First, it argues that the "Terms of Sale" caps any damages at the amount paid for the meters in question. (Sensus Mem. in Supp. at 29-32.) Because the Court concludes, as noted above, that there exists a genuine issue whether the "Terms of Sale" was sent with each purchase acknowledgement, it will not limit Cannon's damages on this basis.

Second, it argues that any breach-of-warranty damages must be limited to meters delivered on or after December 23, 2004, since Cannon commenced this action on December 23, 2008, and Minnesota has a four-year statute of limitations for breach-of-warranty actions. (<u>Id.</u> at 32.) Cannon responds that it may recover for iCon Meters purchased before that date because Sensus fraudulently concealed the meter's defect, thereby tolling the statute of limitations. (Cannon Mem. at 30-33.) Yet, fraudulent concealment requires more than simply an omission; it requires an act or statement – "something of an affirmative nature" – designed to prevent discovery of a cause of

_____

[18] Sensus raised this issue for the first time in its Reply, but the Court afforded Cannon an opportunity to address it before oral argument.

action.  <u>Wild v. Rarig</u>, 234 N.W.2d 775, 795 (Minn. 1975).  "In no case . . . is mere

silence or failure to disclose sufficient in itself to constitute fraudulent concealment."

<u>Helleloid v. Indep. Sch. Dist. No. 361</u>, 149 F. Supp. 2d 863, 869 (D. Minn. 2001)

(Erickson, M.J.); <u>accord, e.g.</u>, <u>Appletree Square 1 Ltd. P'Ship v. W.R. Grace & Co.</u>, 815

F. Supp 1266, 1275 (D. Minn. 1993) (Kyle, J.).  The only alleged "concealment" here

was an omission:  Sensus's failure to disclose the defective design of the iCon Meter.

Accordingly, damages for the breach-of-implied-warranty claim must be limited to iCon

Meters sold on or after December 23, 2004.[19]

## II.    Sensus's claims against Vishay

Sensus's claims against Vishay are similar to Cannon's claims against Sensus,

with some slight variations.  The claims are discussed in turn below.

### A.    Breach of express warranty

Sensus argues that the specification sheet for the 336 Capacitor created an express

warranty that Vishay breached in three ways.  (Sensus Mem. in Opp'n at 18-26.)  None

of its contentions passes muster.[20]

---

[19] Sensus also argues in its Reply that Cannon unreasonably decided to replace *all* MCT Meters, including many that had not failed.  (Sensus Reply at 1-2.)  The Court declines to address that argument.  <u>See</u> D. Minn. LR 7.1(b)(3) (reply memorandum may not raise new grounds for relief).

[20] Vishay argues, at the outset, that the express-warranty claim fails because there exists no evidence that Sensus ever reviewed the specification sheet.  (Vishay Reply at 12-13.)  This argument is a non-starter.  Even if Vishay were correct, there is evidence in the record indicating that *Sentec* reviewed and relied on the specification sheet before selecting the 336 Capacitor.  (<u>See</u> England Decl. ¶ 8; England 5/26/10 Dep. Tr. at 41-42; Dungan Decl. Ex. 5.)  And under the UCC, a "seller's warranty . . . extends to any person who may reasonably be expected to use, consume or be affected by goods."  UCC § 2-318.

Sensus notes that the specification sheet rates the 336 Capacitor for use at 275 volts, but neglects to mention that it suffers corona discharge at 220-230 volts. (Id. at 21-22.) It further notes that the specification sheet fails to indicate that the Capacitor cannot be used in a "series impedance" application. (Id. at 22-25.) But a *failure* to include information in the specification sheet is the exact opposite of an *express* warranty. The specification sheet says nothing about corona discharge or "series impedance" use. Hence, these failures cannot amount to inaccurate "affirmation[s] of fact" or "description[s]" of the 336 Capacitor, which is what an express warranty requires. UCC § 2-313(1). While perhaps these omissions could support a fraud or fraudulent-inducement claim (which Sensus has not alleged), they are simply insufficient to support a breach of warranty.

Sensus also argues that the tolerance listed on the specification sheet – indicating that the 336 Capacitor was rated at 470 nF ± 20% – was violated because *all* 336 Capacitors produced by Vishay fell below 470 nF and, hence, were not "normally distributed." (Sensus Mem. in Opp'n at 20.) But the listed tolerance does not, in the Court's view, create a warranty that Vishay's 336 Capacitors would be distributed in a "bell curve" both above and below 470 nF. Rather, it merely warranted that each individual 336 Capacitor produced by Vishay would have a capacitance "out of the box" between 376 nF (470 nF minus 20%) and 564 nF (470 plus 20%). And there is no evidence before the Court that any of the 336 Capacitors Sensus purchased from Vishay had a capacitance below 376 nF "out of the box."

**B.      Breach of implied warranty**

Sensus alleges that Vishay breached the implied warranty of merchantability because the 336 Capacitor was not fit for its ordinary use.  (Sensus Mem. in Opp'n at 26-28.)  Vishay argues that this claim must be dismissed because Sensus misused the 336 Capacitor in a "series impedance" application rather than an "across the line" application.  (Vishay Mem. at 18-19.)  The problem with this argument is that the "ordinary use" of the 336 Capacitor is in dispute.

The crux of Vishay's argument is that the specification sheet's "Application Notes" – which states that the capacitor was intended "[f]or X2 electromagnetic interference suppression in across the line applications" (Dungan Decl. Ex. 11) – sets forth the only appropriate use for the 336 Capacitor.  (See Hear. Tr. at 43 ("They're the specified uses.  They are . . . what the capacitor is for.").)  In fact, according to Vishay, Sensus *admitted* that "application notes in specification sheets indicate which particular applications are appropriate for the component."  (Vishay Mem. at 12.)  But the evidence cited by Vishay to support that argument – deposition testimony from Steiner – contains no so such admission.  Indeed, when asked if the applications listed on a product's specification sheet are its only appropriate uses, Steiner answered, "It's a *suggestion*." (Steiner Dep. Tr. at 63 (emphasis added).)

The determination of the 336 Capacitor's "ordinary use" is not as simple as Vishay would have the Court believe.  According to the leading commentators on the UCC, courts typically look to (*inter alia*) a product's "usage in the trade" and the "characteristics exhibited by goods of the same class that are manufactured by persons

other than the seller in question" when determining a product's ordinary use. 1 James J. White & Robert S. Summers, Uniform Commercial Code § 9-13 (5th ed. 2009). Here, those factors suggest that a "series impedance" application may indeed be an "ordinary use" for the 336 Capacitor.

Notably, at least one Sensus witness acknowledged in his deposition that the 336 Capacitor in some circumstances "can be used in a series impedance application." (Stevens 4/14/10 Dep. Tr. at 176.) Moreover, there is evidence indicating that several other Vishay customers were using the 336 Capacitor in "series impedance" applications. (Id. at 171-72; Stevens 4/15/10 Dep. Tr. at 139.) Finally, the record also reflects that other companies in the marketplace were using capacitors constructed similarly to the 336 Capacitor in "series impedance" applications. (Henderson Dep. Tr. at 62-63, 224-25; Stevens 4/15/10 Dep. Tr. at 204-05.)[21]

Under these facts, the Court concludes that there exists a genuine issue whether an ordinary use of the 336 Capacitor is in a "series impedance" application. As a result, the Court determines that Vishay's Motion must be denied with respect to the implied-warranty claim, because there is no dispute that the 336 Capacitor failed when used in that fashion. Indeed, Vishay conceded in the 8D Reports that the capacitor was not fit for that purpose. (Dungan Decl. Exs. 17-19.)

Vishay also argues that Sensus "misused" the 336 Capacitor in two other ways. First, it notes that the capacitor is self-healing, meaning that "it is expected to degrade

---

[21] According to Sensus, the reason that a capacitor certified for "across the line" applications can be used in "series impedance" applications is that "series impedance" exposes a capacitor to less voltage. (England 5/26/10 Dep. Tr. at 45-46.)

over time." (Vishay Reply at 15.) Hence, it contends Sensus misused the capacitor because the iCon Meter's power supply was directed through a component it knew would eventually degrade. (Id. at 16 ("[W]hat Sensus needed was a capacitor that . . . would not lose capacitance due to self-healing characteristics.").) Yet, this argument ignores that Vishay's suggested replacement for the 336 Capacitor *was itself an X2 class, self-healing capacitor.* (Dungan Decl. Exs. 17-19.) It also ignores that Sensus later used that replacement capacitor in the iCon Meter without problems. (England 5/26/10 Dep. Tr. at 169; Mazza 6/18/10 Dep. Tr. at 76.) Hence, there is no merit to the contention that Sensus was "misusing" the 336 Capacitor because of its self-healing capabilities.

Second, Vishay argues that Sensus erred by designing the iCon Meter in a way that would expose the capacitor to constant voltage, since it had "a tested life of only 1,000 hours." In support of that contention, it points to the capacitor's certification under the IEC 60384.14 2nd edition testing standard (the so-called "accelerated life" test discussed above). (Vishay Mem. at 9; Vishay Reply at 14-15.) But that certification does not aid Vishay's argument. While it is true that the capacitor was certified not to lose more than 10% capacitance after 1,000 hours of "accelerated" (*i.e.*, stressed) use, the certification says nothing about how long the capacitor could be expected to function. (See England 5/26/10 Dep. Tr. at 59.) Indeed, it would make little sense for Vishay to acknowledge that the 336 Capacitor loses 2-6 nF of capacitance for every 1,000 hours of use (Stevens 4/14/10 Dep. Tr. at 144) if it were only expected to last for 1,000 hours.[22]

_____

[22] Before the hearing on the parties' Motions, the Court questioned whether Sensus's "sophisticated buyer" argument applied equally to its claims against Vishay even though Vishay

**C.     DTPA**

Sounding a familiar refrain (see supra at 28-29), Vishay argues that Sensus's DTPA claim must be dismissed because only injunctive relief is authorized under the statute, and Sensus's Third-Party Complaint merely seeks damages for Vishay's conduct. (Vishay Mem. at 20.)  Vishay is correct that Sensus's DTPA claim purports to seek only "damages in excess of $75,000, the precise amount to be determined at trial."  (Doc. No. 55 ¶ 41.)  Nevertheless, Sensus falls back on generic language in its prayer for relief that the Court should award "other and further relief as this Court deems just and equitable." (Sensus Mem. in Opp'n at 32.)

The Court is hesitant to construe Sensus's boilerplate language, which appears in nearly every pleading filed in this Court, as sufficient to preserve a claim for injunctive relief when such relief is not *specifically* pleaded in connection with a claim.[23]  Nor, in the Court's view, can Sensus's DTPA claim reasonably be read to seek redress for anything other than *past* conduct.  See Summit Recovery, 2010 WL 1427322, at *5 (dismissing DTPA claim because plaintiff alleged "a single deceptive practice . . . in 2006," and "[p]ast injury does not give rise to equitable relief").  Regardless, the Court

---

had not moved for summary judgment on that basis, and it invited supplemental briefing on that issue.  Somewhat ironically, Vishay then devoted a substantial portion of its oral argument to this issue, even though it had not initially moved for summary judgment on that ground.  Regardless, the Court concludes that the record is insufficiently developed to determine, as a matter of law, that Sensus was equally or more knowledgeable than Vishay regarding capacitors.

[23] Notably, Sensus seeks dismissal of Cannon's DTPA claim on this same ground even though Cannon's prayer for relief seeks "[s]uch other and further relief to which Cannon may be justly entitled."  (Doc. No. 33 at 8.)

concludes that even if the claim could be construed to include prospective conduct, no injunctive relief under the DTPA is warranted and, hence, the claim must be dismissed.

In support of its claim, Sensus argues that Vishay must amend the 336 Capacitor's specification sheet in three ways. (Sensus Mem. in Opp'n at 32.) First, it asserts that Vishay must list the tolerance of the 336 Capacitor as 470 nF *minus* 20%, rather than 470 nF *plus or minus* 20%, since Vishay intentionally aims for the low end of the range in its manufacturing process. But, as discussed in more detail above, there is nothing misleading about Vishay's tolerance specification – it indicates that any "out of the box" 336 Capacitor Vishay manufactures can have an initial capacitance as low as 376 nF, and there is no evidence that is not the case. As long as Vishay's capacitors fall within the specified range, the tolerance on the specification sheet is accurate. Second, Sensus asserts that Vishay must disclose that capacitance drops over time. But this is true of all self-healing capacitors, and hence no reasonable buyer could expect the 336 Capacitor to maintain its capacitance forever. Third, Sensus asserts that Vishay should be required to indicate the corona onset point for the 336 Capacitor. But corona discharge is well-known in the electrical industry, and Sensus's own witnesses testified it is not standard industry practice to include corona onset information in specification sheets for capacitors. (Mazza 6/18/10 Dep. Tr. at 123; Wollenberg Dep. Tr. at 257-58.)

Simply put, the Court does not believe that any of the changes Sensus seeks are necessary to prevent the specification sheet from misrepresenting the 336 Capacitor's "standard, quality or grade," <u>Dennis Simmons, D.D.S., P.A. v. Modern Aero, Inc.</u>, 603 N.W.2d 336, 339 (Minn. Ct. App. 1999), or to prevent it from suggesting it possesses

"characteristics, . . . benefits, or qualities" that it lacks, Minn. Stat. § 325D.44.

Accordingly, the DTPA claim cannot stand.  Id.

### D.    Contribution/indemnity

Sensus's final claim against Vishay seeks contribution and indemnification "[i]n the event Cannon is successful in its claims" against Sensus.  (Sensus Mem. in Opp'n at 35, 38.)  Vishay argues that this claim must be dismissed because it violated no duties, contractual or otherwise, because the 336 Capacitor was not defective and performed as promised in the specifications.  (Vishay Mem. at 22-23.)  As set forth above, however, the Court has determined that Sensus has a viable implied-warranty claim against Vishay, and it has also found that Cannon has viable claims against Sensus.  Accordingly, the contribution claim may stand.

Vishay also argues that this claim is barred by Minnesota's version of the economic-loss doctrine.  (Vishay Mem. at 29-31.)  As Sensus correctly notes, however, this contention has been squarely rejected by the Minnesota Court of Appeals – the economic-loss doctrine precludes actions in tort, but contribution-indemnity is an equitable claim and therefore is not precluded.  See City of Willmar v. Short-Elliott-Hendrickson, Inc., 512 N.W.2d 872, 876 (Minn. Ct. App. 1994).

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** as follows:

1.      Sensus's Motion for Summary Judgment (Doc. No. 70) is **GRANTED IN PART** and **DENIED IN PART**.  The Motion is **GRANTED** with respect to Cannon's

claims for breach of contract (construed as breach of express warranty) and violation of

the DTPA, and those claims are **DISMISSED WITH PREJUDICE**.  The Motion also is

**GRANTED** to the extent it seeks to limit warranty damages to those iCon Meters

Cannon purchased on or after December 23, 2004.  In all other respects, the Motion is

**DENIED**;

2.      Vishay's Motion for Summary Judgment (Doc. No. 76) is **GRANTED IN

PART** and **DENIED IN PART**.  The Motion is **GRANTED** with respect to Sensus's

claims for breach of express warranty and violation of the DTPA, and those claims are

**DISMISSED WITH PREJUDICE**.  In all other respects, the Motion is **DENIED**; and

3.      Cannon's Motion to Strike (Doc. No. 105) is **DENIED** as moot.

Date:  August 19, 2010

s/Richard H. Kyle_____
RICHARD H. KYLE
United States District Judge